**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

BATINA LATRAE KISTNER,                    )
                                          )
        Plaintiff,                        )
                                          )
v.                                        )        No. 3:24-cv-00277
                                          )
ENVISION AESC US, LLC,                    )
                                          )
        Defendant.                        )

<u>MEMORANDUM OPINION</u>

Before the Court in this employment discrimination and retaliation case is Envision AESC

US, LLC's ("AESC") Motion for Summary Judgment (Doc. No. 26), which has been fully briefed

and is ripe for decision (Doc. Nos. 27, 30, 39).  For the following reasons, AESC's Motion will be

granted in part and denied in part.

**I.      BACKGROUND AND UNDISPUTED FACTS[1]**

Batina Kistner worked for various employers at the Nissan Battery Plant starting in 2013.

(Doc. No. 31 ¶ 1).  She initially worked for a staffing company called "Yates Services" before

becoming a direct employee of Nissan in mid-2015.  (<u>Id.</u> ¶¶ 2–3).  In 2019, Kistner became an

employee of AESC after it purchased the Battery Plant from Nissan.  (<u>Id.</u> ¶ 4).  As a

"Manufacturing Technician" at AESC, Kistner operated machinery that made batteries for electric

vehicles.  (<u>Id.</u> ¶¶ 5–6).

---

[1] The facts in this section are undisputed unless noted otherwise and are drawn from the undisputed
portions of AESC's Statement of Undisputed Material Facts (Doc. No. 31), the exhibits and
deposition transcripts submitted in connection with the summary judgment briefing, and portions
of the operative Second Amended Complaint (Doc. No. 24) that are not contradicted by the
evidence in the record.

In late 2020, Kistner began training for a new position with her co-worker Melissa Skelton. (Id. ¶ 14; Doc. No. 29-1 at 32). On February 4, 2021,[2] at around 4:15 p.m., Skelton confronted Kistner because she found out that Kistner had asked for a different employee to train her. (Doc. No. 31 ¶ 15). Skelton "got in [Kistner's] face" and triggered her Post Traumatic Stress Disorder ("PTSD") during this incident. (Id. ¶¶ 15, 24; Doc. No. 29-1 at 32–33). Kistner believed she needed to leave work early because of her PTSD symptoms, but she could not find her "supervisor," Josh Blay, to ask for permission because he had already left for the day. (Doc. Nos. 24 ¶ 25; 31 ¶ 18; 29-1 at 33; see also Doc. No. 30 at 7). She also could not find the other on-duty supervisor, Chad Blatt, because he was in a meeting. (Doc. No. 31 ¶ 18; Doc. No. 29-1 at 33). Kistner resorted to telling her "lead," Chance Stanley, that she needed to go home because Skelton had triggered her PTSD. (Doc. Nos. 31 ¶ 19; 29-1 at 49). Stanley asked Kistner if she wanted to report the incident to HR, but she said "no." (Doc. No. 31 ¶ 20). Stanley told her she could leave work, and Kistner left about thirty minutes before her shift ended. (Id. ¶ 21). When Kistner returned to work the next day, she told her supervisor Blay that she had left early because Skelton triggered her PTSD. (Id. ¶¶ 23–24).

AESC's Technician Handbook provides, among other things, that "[l]eaving [an] assigned work area during a shift *without a supervisor's permission* (unless such activity is protected by law)" "may result in termination even for the first offense." (Doc. No. 29-1 at 115 (emphases added)). Blay testified that AESC had a history of enforcing this policy and automatically terminating employees who left their shift early without permission. (Doc. No. 36 at 18–21). In

---

[2] AESC's Statement of Undisputed Material Facts indicates that this event took place in February 2020, rather than in February 2021. (See Doc. No. 31 ¶ 15). The Court presumes that "2020" is a typographical error because the supporting citations all indicate that this incident occurred in February 2021. (See Doc. No. 29-1 at 33).

fact, he could recall "only one instance" where an employee was "allowed to continue working" after leaving their shift early. (Id. at 19–20). Nevertheless, Blay recommended that Kistner receive a "final written" reminder (rather than termination) for leaving early because she was a "senior person" with an otherwise positive work history. (Doc. Nos. 31 ¶ 27; 18–19). A final written reminder is the third step in AESC's "Corrective Action Process," with the fourth and final step being termination. (Doc. No. 29-1 at 115). A final written reminder "is generally in effect for a minimum of 12 months," during which the employee is "ineligible for promotion or transfer" and "may be terminated if they have another unrelated incident that would justify a written reminder." (Doc. No. 34 at 8–9, 19–21; see also Doc. No. 36 at 24–25). On February 9, 2021, Tarji Beatty and Brian Sears from HR accepted Blay's recommendation and issued Kistner a final written reminder. (Doc. No. 31 ¶ 28).

A few days later, Kistner's therapist, Landra Orr, recommended that she "take several weeks off to deal with everything." (Id. ¶¶ 34–35). The company approved Kistner's request to take a full twelve weeks of leave under the Family and Medical Leave Act ("FMLA") starting on or around February 23, 2021.[3] (Id. ¶ 36). On or around May 17, 2021, Orr wrote a letter to AESC stating that Kistner "has been under my care and is now able to return to work . . . without any need for accommodation." (Id. ¶ 37; see also Doc. No. 29-1 at 157–59). Kistner returned to work on May 19, 2021. (Doc. No. 31 ¶ 8).

Within two days of returning to work, Kistner told Tim Embody that she "felt pressured to return to work because she had exhausted her [FMLA leave] and did not want to lose her job." (Id. ¶¶ 38–39; Doc. No. 29-1 at 160). Kistner then received permission to take leave pursuant to

---

[3] AESC uses a third-party benefits administrator called "Symetra" to administer leaves of absences for its employees. (Doc. No. 31 ¶ 33).

AESC's Medical Leave Policy. (Doc. No. 31 ¶ 40). The Medical Leave Policy provides that employees are eligible for twelve months of medical leave, and "[i]f additional leave is needed as a reasonable accommodation beyond the amount of time afforded as a Medical Leave, [the employee] may request additional leave for consideration through HR." (Id. ¶ 42; Doc. No. 29-1 at 119). Kistner returned to leave status starting May 21, 2021. (Doc. No. 31 ¶ 40). In July 2021, Kistner informed AESC that she was "doing intense outpatient therapy" and would be returning to work when her extended leave ended on August 25, 2021. (Id. ¶¶ 43–47). But August 25 came and went, and Kistner did not return to work. (Id. ¶ 48).

In late February or early March of 2022, Embody sent Kistner a letter that read, in part, as follows:

> [AESC] plans to proceed with terminating your employment because you have exhausted your leave under the FMLA and [AESC's] Medical Leave policy and you have not returned to work. If you believe additional leave is needed as a reasonable accommodation, you may make this request in writing to me. Along with any such accommodation request, please include a letter from your health care provider[.] . . . Please make any requests for accommodation within two weeks from receipt of this letter.

(Doc. Nos. 29-1 at 164; 38 at 1305–08; see also Doc. No. 31 ¶ 51). Kistner responded by asking to extend her leave until September 1, 2022, as she was "[s]till attending weekly counselor sessions and undergoing trauma therapy due to [her] PTSD[.]" (Doc. No. 32-4 at 5). Orr sent a supporting letter to AESC on March 21, 2022, stating that Kistner's "progress has been up and down" but that "[i]t is hoped that she can return to work September 1, [2022]." (Doc. No. 29-1 at 166; see also Doc. No. 31 ¶¶ 54–56). On March 30, 2022, Embody responded with a termination letter:

> Thank you for responding to our request for additional information regarding your current leave.
>
> You have been absent from work since February 23, 2021 and you have exhausted all available sick and vacation leave as well as the unpaid leave of absence granted to you as an accommodation. You are not eligible for any additional leave as

4

> required by state and federal laws or under any company policy.  Regrettably, we
> must terminate your employment effective, March 30, 2022.

(Doc. No. 29-1 at 165; see also Doc. No. 31 ¶¶ 58–59).  It is undisputed that Embody and Spears made the decision to deny Kistner's request for more leave and to terminate her employment. (Doc. No. 31 ¶ 60).

As a result of her termination, Kistner brought this lawsuit against AESC alleging discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA") and the Tennessee Disability Act ("TDA").  (Doc. No. 24 ¶¶ 51–77).  She further alleges that AESC retaliated against her under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Tennessee Human Rights Act ("THRA") because she reported sexual harassment during her employment with Yates Staffing, Nissan, and AESC at the Battery Plant.  (Id. ¶¶ 78–85).  AESC moves for summary judgment on all five counts in the Second Amended Complaint.  (Doc. No. 26).

## II.  LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts."  Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).  In deciding a motion for summary judgment, the Court generally reviews all the evidence, facts, and inferences in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).  The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter, and instead determines only whether the evidence presented reveals a disputed material issue of fact for the jury to decide.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The mere existence of

a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party.  Rodgers, 344 F.3d at 595.

## III.    ANALYSIS

The Court analyzes Kistner's claims as follows:  failure to engage in the interactive process under the ADA (Count III); failure to accommodate under the ADA (Count II); disability discrimination under the ADA and TDA (Count I); and retaliation under the ADA, Title VII, and THRA (Counts IV and V).

### A.    Failure to Engage in the Interactive Process

As an initial matter, the Court easily disposes with Count III because an employer's "failure to engage in the interactive process does not give rise to an independent claim[.]"  Thompson v. Fresh Prod., LLC, 985 F.3d 509, 525 (6th Cir. 2021); see also Arndt v. Ford Motor Co., 247 F. Supp. 3d 832, 851 (E.D. Mich. 2017) (holding that "an employer's alleged failure to engage in good faith in the interactive process is not independently actionable under the ADA").  Instead, an employer's failure to engage in the interactive process is merely a way to prove a failure to accommodate claim.  See Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 871 (6th Cir. 2007) (analyzing an employer's alleged "failure to engage in the interactive process" in the context of a failure to accommodate claim); Singh v. Vanderbilt Univ. Med. Cntr., 2020 WL 243711, at *8 n.10 (M.D. Tenn. Jan. 16, 2020) (collecting cases).  This widely accepted understanding also makes practical sense because "a plaintiff would not have any appreciable damages stemming from the mere fact that the defendant failed to interact or engage with her regarding reasonable accommodations; any damages would flow from the defendant denying the plaintiff her requested accommodation."  Veith v. Tyson Fresh Meat, Inc., 2022 WL 1231229, at *8 (M.D. Tenn. Apr. 26, 2022).

6

Accordingly, the Court will dismiss Kistner's standalone claim for failure to engage in the interactive process in Count III.

B.     Failure to Accommodate

Kistner alleges that AESC failed to accommodate her disability in two ways:  (i) by giving her a final written reminder after she asked to leave her shift early, and (ii) by denying her request for extended medical leave before her termination.  The ADA's "broad definition of discrimination includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  Fisher v. Nissan N. Am., Inc., 951 F.3d 409 (6th Cir. 2020) (citation and internal quotation marks omitted).  "ADA failure to accommodate claims are analyzed pursuant to the direct [evidence] test," rather than under the McDonnel Douglas framework.  Id. at 416–17; Kleiber, 485 F.3d at 868.

This direct evidence test requires Kistner to show: (1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) AESC knew or had reason to know about her disability; (4) she requested an accommodation; and (5) AESC failed to provide the necessary accommodation.  Johnson v. Cleveland City School Dist., 443 F. App'x 974, 982–83 (6th Cir. 2011).  If Kistner "establishes a prima facie case, the burden shifts to [AESC] to demonstrate that any particular accommodation would impose an undue hardship on" its business.  Id. (citation omitted).

1.     Request to Leave Shift Early

Kistner first alleges that AESC denied her accommodation request "to leave her shift because of a flare of her PTSD symptoms" when it issued her a final written reminder.  (See Doc.

No. 30 at 1, 15). The Court focuses on the fifth element of Kistner's prima facie case—*i.e.*, whether AESC failed to provide a reasonable accommodation—because it is dispositive of this claim.

"An employee raising a failure-to-accommodate claim bears the initial burden to propose an accommodation that is reasonable." Russ v. Memphis Light Gas & Water Division, 720 F. App'x 229, 239 (6th Cir. 2017); see also Kleiber, 485 F.3d at 870. Kistner satisfied this burden because she asked Stanley "to leave her shift early as a reasonable accommodation for her disability." (See Doc. No. 30 at 16 n.3). It appears, however, that AESC granted Kistner the exact reasonable accommodation she asked for because it is undisputed that she *did* leave her shift early. That is fatal to Kistner's prima facie claim.

Kistner suggests that she implicitly requested to leave work early *and* have total immunity from the job abandonment policy in AESC's Technician Handbook. (See Doc. No. 30 at 15). The Court notes the creativity of this argument, but Kistner has not provided any evidence upon which the Court could infer that she made this request to anyone at AESC. Accordingly, AESC is entitled to summary judgment on Kistner's failure to accommodate claim based on her request to leave her shift early.

### 2. Request for Extended Medical Leave

Kistner separately alleges that AESC failed to accommodate her request for an extension of her medical leave. (Doc. No. 24 ¶¶ 44–48, 58–65). For this claim, there is no dispute that Kistner is disabled because of her PTSD, AESC knew about her disability, she proposed an accommodation for extended leave on March 21, 2022, and AESC denied her request. (Doc. No. 31 ¶¶ 51–60). Nevertheless, AESC argues that Kistner cannot establish a prima facie accommodation claim based on her termination because she has not shown "she is otherwise qualified for the position, with or without reasonable accommodation." Johnson v. Cleveland City School Dist., 443 F. App'x 974, 982–83 (6th Cir. 2011). The Court disagrees.

8

A jury could find that Kistner was otherwise qualified for her position with the accommodation she and Orr proposed in their March 21, 2022 letters because there is a dispute of fact regarding whether she could perform her job starting on September 1, 2022. AESC's primary counterargument is that Kistner was not qualified for her position because she had no clear prospect for recovery and could not provide a certain date for her leave to end. (Doc. No. 27 at 16). The Sixth Circuit has held that "[a]n employer is not required to keep an employee's job open indefinitely," and "additional leave is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated no clear prospects for recovery." Williams v. AT&T Mobility Servs. LLC, 847 F.3d 384, 394 (6th Cir. 2017) (citation and internal quotation marks omitted). Here, however, Kistner and Orr identified September 1, 2022, as the date that Kistner hopefully could return to work. Orr couched her request by saying she "hoped" Kistner could return to work then, but this simply creates a factual issue about whether Kistner had a clear and definite return date. Viewing the evidence in the light most favorable to Kistner, the Court finds that Kistner has presented "evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." See EEOC v. Ford Motor Co., 782 F.3d 753, 766 (6th Cir. 2015).

The Court concludes that Kistner requested a reasonable accommodation when she asked for more leave. Where, as here, an employee notifies her employer that she needs an accommodation for her disability, the employer must engage in an "informal, interactive process" with that employee to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." Brumley v. United Parcel Serv., Inc., 909 F.3d 834, 840 (6th Cir. 2018) (quoting Kleiber, 485 F.3d at 868–69); see also 29 C.F.R. § 1630.2(o)(3). "[T]he interactive process is mandatory, and both parties have a duty to

participate in good faith, even "though the interactive process is not described in the [ADA's] text." Kleiber, 485 F.3d at 871.

There is no evidence in the record that AESC engaged in the mandatory interactive process. Embody sent Kistner a letter inviting her to "make any requests for accommodation within two weeks from receipt of this letter," and Kistner (and Orr) responded by asking to extend her leave until September 1, 2022. (See Doc. Nos. 29-1 at 164, 164; 32-4 at 5). Kistner's request triggered AESC's duty to engage in an interactive process to identify a reasonable accommodation for her to retain her job. Instead of engaging in this process or suggesting any alternative accommodations, AESC merely terminated Kistner's employment without further discussion. (Doc. No. 29-1 at 166). AESC's only response to this argument is that it had no obligation to engage in the interactive process because Kistner could not identify any clear prospect of her recovery or a certain date for her to return to work. (Doc. No. 27 at 17–18). As the Court already held, that is an issue of fact that the jury will resolve at trial. A jury construing all evidence in Kistner's favor could find that AESC did not fulfill its mandatory duty to engage in the interactive process. As such, summary judgment is not appropriate on Kistner's claim that AESC failed to accommodate her request for extended medical leave.

C.     Disability Discrimination

Kistner also claims that AESC violated the ADA and TDA when it gave her a final written reminder and when it terminated her employment. (Doc. No. 24 ¶¶ 51–57). The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability" with respect to her "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Courts

generally analyze TDA claims under the same framework as ADA claims.[4] Cardenas-Meade v. Pfizer, Inc., 510 F. App'x 367, 370 (6th Cir. 2013).

To survive summary judgment, Kistner must support her disability discrimination claims with either direct or circumstantial evidence. Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 452 (6th Cir. 2004). "Direct evidence of disability discrimination does not require the fact finder to draw any inferences [to conclude] that the [employee's] disability was at least a motivating factor" in the employer's actions. Fisher, 951 F.3d at 416 (citation and internal quotation marks omitted). An example of direct evidence could be "an employer telling an employee, 'I fired you because you are disabled.'" Burress v. City of Franklin, 809 F. Supp. 2d 795, 810 (M.D. Tenn. 2011) (quoting Smith v. Chrysler Corp., 15 F.3d 799, 805 (6th Cir. 1998)). "Circumstantial evidence" of discrimination "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (citation omitted).

Although an employee always bears the ultimate burden of showing that her employer discriminated against her because of her disability, the applicable burdens at the *summary judgment* stage differ depending on whether she relies on direct or circumstantial evidence. "In direct evidence cases, once a plaintiff shows that [her disability] played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by" her disability. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000)). In circumstantial evidence cases, the Court applies the well-known burden-shifting framework set forth in McDonnell Douglas

---

[4] Unlike the ADA, the TDA does not require employers to make reasonable accommodations for employees. See Caldwell v. Omega Apparel Inc., 2015 WL 7455553, at *7 (M.D. Tenn. Nov. 23, 2015).

<u>Corp. v. Green</u>, 411 U.S. 792, 793 (1973). Under this framework, the employee must first establish a prima facie case of discrimination. <u>Williams v. Union Underwear Co.</u>, 614 F. App'x 249, 253–54 (6th Cir. 2015). Only after making this showing does the burden shift to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action, after which the burden returns to the employee to show that the employer's proffered reason was mere pretext for discrimination. <u>Id.</u>

Here, Kistner claims that AESC discriminated against her by: (i) issuing her a final written reminder on February 9, 2021, and (ii) terminating her employment on March 30, 2022. (<u>See</u> Doc. No. 24 ¶¶ 55). For the following reasons, the Court finds that both claims should proceed to trial.

### 1.    Final Written Reminder

Kistner first argues that her discrimination claim "is supported by direct evidence." (Doc. No. 30 at 14). Specifically, she contends that AESC's "failure to consider the possibility of [a] reasonable accommodation in the form of an exception to" its job abandonment policy is direct evidence that AESC gave her a final written reminder because of her PTSD. (Doc. No. 30 at 13). Kistner appears to be relying on the principle that discrimination claims based on a failure to accommodate "necessarily involve direct evidence (the failure to accommodate) of discrimination." <u>Kleiber</u>, 485 F.3d at 868. The Court disagrees that this standard applies because Kistner's argument requires an inference of discrimination and thus cannot be direct evidence.

"To establish a prima facie case" of disability discrimination under the first step of the <u>McDonnel Douglas</u> framework, "an employee must demonstrate that (1) she has a disability, (2) she is otherwise qualified for the job with or without reasonable accommodation, (3) she suffered an adverse employment decision, (4) her employer knew or had reason to know of her disability, and (5) her position remained open, or she was replaced." <u>Hrdlicka v. Gen. Motors, LLC</u>, 63 F.4th

555, 572 (6th Cir. 2023). AESC argues that Kistner "cannot establish [her] prima facie case because the final written [reminder] was not an adverse employment action." (Doc. No. 27 at 9). An adverse employment action requires "some harm" to "an identifiable term or condition of employment," even if that action is not "serious," "significant," or "substantial." Muldrow v. City of St. Louis, 601 U.S. 346, 354–55 (2024). "In short, the employment action is adverse if it leaves the employee 'worse off respecting employment terms or conditions.'" McNeal v. City of Blue Ash, 117 F.4th 887, 900 (6th Cir. 2024) (quoting Muldrow, 601 U.S. at 355).

Kistner has raised a genuine issue of material fact that her final written reminder was an adverse employment action. An employee who receives a final written reminder is not eligible for a promotion or job transfer for twelve months, and AESC could immediately terminate that employee if they violate any other company rule. (Doc. No. 34 at 19–21; see also Doc. Nos. 34 at 8–9; 36 at 24–25). In a similar case, the Sixth Circuit held that a "final written warning" could be an adverse employment action if it makes the "employee ineligible for promotions or raises for a one-year period." Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 348 (6th Cir. 2012). Here, too, a jury could find that Kistner's final written reminder left her "worse off" at AESC for at least twelve months. See Foust v. Metro. Sec. Servs., Inc., 829 F. Supp. 2d 614, 628 (E.D. Tenn. 2011).

AESC responds that it gave Kistner a final written reminder because she violated the Technician Handbook by leaving her shift early without permission. (Doc. No. 27 at 10). The Technician Handbook supports AESC's position, as it clearly provides that employees could be *terminated* for leaving early under certain circumstances. (Doc. No. 29-1 at 115). The Court finds that AESC has met its light burden of production to articulate a legitimate, nondiscriminatory reason for giving Kistner a final written reminder.

13

Step three of the McDonnel Douglas framework shifts the burden back to Kistner to present evidence of pretext for unlawful disability discrimination. Hrdlicka, 63 F.4th at 568. To establish pretext and survive summary judgment, she must show that AESC's "proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." Id. (quoting Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 285 (6th Cir. 2012)).

Kistner contends that AESC's stated reason is pretextual because there are disputes of fact regarding whether she even violated AESC's Technician Handbook to begin with. To reiterate, the handbook provides that employees cannot leave their "assigned work area during a shift without a supervisor's permission (unless such activity is protected by law)." (Doc. No. 29-1 at 115). Kistner argues that she substantially complied with this policy because Stanley gave her permission to leave early. (Doc. No. 29-1 at 36). She does not dispute that Stanley was a "lead," and not a formal "supervisor." (Doc. No. 31 ¶¶ 19, 22). However, she testified that when supervisors are unavailable, leads are the highest-ranking employees at the company and have the authority to let employees leave their shifts early. (Doc. Nos. 29-1 at 36; 31 ¶ 9). AESC reads the policy literally and maintains that only supervisors can grant permission for employees to leave early. (Doc. No. 31 ¶ 9). Regardless of who is correct, summary judgment is not warranted because there is a clear factual dispute for the jury to resolve about whether Kistner violated the job abandonment policy.

Moreover, even if Kistner technically did violate the job abandonment policy, she argues that AESC "cannot rely on its policy to justify the issuance of the final written" reminder because it did not consider providing an exception to the policy as a reasonable accommodation for her PTSD. (Doc. No. 30 at 13). In support of this argument, Kistner relies heavily on the Sixth Circuit's language in EEOC v. Dolgencorp, LLC that "a company may not illegitimately deny an

14

employee a reasonable accommodation to a general policy and use that same policy as a neutral basis for firing" her. 899 F.3d 428, 435 (6th Cir. 2018). For example, the panel explained that a school "that lacked an elevator to accommodate a teacher with mobility problems . . . could not refuse to assign him to classrooms on the first floor, then turn around and fire him for being late to class after he took too long to climb the stairs between periods." Id. Similarly, the employer in Dolgencorp could not prohibit its diabetic employee from keeping her own orange juice at the register for emergency purposes, and then fire her for drinking the company's orange juice during a "hypoglycemic episode." Id. Kistner's argument finds support in the record because AESC did not always strictly enforce its job abandonment policy against employees who left their shifts for medical reasons or to use the restroom without approval. (See Doc. No. 34 at 13–17; see also id. at 22 (noting that an employee received a "Counseling" for leaving his shift early without permission). Accordingly, there is also a dispute of fact regarding whether Kistner violating AESC's job abandonment policy, standing alone, was sufficient to warrant AESC giving her a final written reminder.

Kistner raises several other arguments in her brief regarding pretext, but none are relevant to AESC's reason for the final written reminder. Having found that Kistner has viable theories on which to demonstrate pretext, the Court need not examine these ancillary arguments. Based on the evidence in the record, the Court will deny AESC's motion for summary judgment on Kistner's disability discrimination claim involving her final written reminder.

2.     Termination

Unlike Kistner's final written reminder, her termination reflects direct evidence that AESC discriminated against her because of her disability. That direct evidence is Embody's March 30, 2022, which simultaneously denied her accommodation request for more leave and terminated her

15

employment. (Doc. No. 29-1 at 166); see also Kleiber, 485 F.3d at 868 (holding that ADA discrimination "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination"). "The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." Humphrey v. Mem. Hosps. Ass'n, 239 F.3d 1128, 1140 (9th Cir. 2001). Based on this evidence of AESC's failure to accommodate, a jury could find that there was a direct causal link between Kistner's PTSD and her termination.

The burden of "production and persuasion" then shifts to AESC "to prove that it would have terminated" Kistner for reasons other than her disability. Nguyen, 229 F.3d at 563. AESC does not even attempt to satisfy this burden. Accordingly, the Court will deny AESC's motion for summary judgment on this claim as well.

D.      Retaliation

Last, Kistner alleges that AESC unlawfully retaliated against her for engaging in protected activity under the ADA (Count IV) and Title VII and the THRA (Count V). The Court analyzes these claims under the same legal framework. Shefferly v. Health All. Plan of Mich., 94 F. App'x 275, 284 (6th Cir. 2004) (ADA and Title VII retaliation claims governed by the same standard); Kessler v. Riccardi, 363 F. App'x 350, 355 (6th Cir. 2010) (Title VII and THRA retaliation claims governed by the same standard). Where, as here, there is no direct evidence of retaliation, the Court applies the same McDonnell Douglas burden-shifting framework discussed above. See A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ., 711 F.3d 687, 697 (6th Cir. 2013). That is, Kistner must first establish a prima facie case of retaliation by showing that: (1) she engaged in activity protected under the ADA, Title VII, or the THRA; (2) AESC knew of that activity; (3) AESC took an adverse action against her; and (4) there was a causal 'but for' connection between the protected

activity and the adverse action.  Rorrer, 743 F.3d at 1046 (citation omitted); see also Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013); Goree v. United Parcel Serv., Inc., 490 S.W. 3d 413, 434 (Tenn. Ct. App. 2015).

       1.     ADA Protected Activity

Kistner's ADA retaliation claim alleges that she "suffered an adverse employment action when [AESC] terminated her *and placed [her] on a final written*" reminder.  (Doc. No. 24 ¶ 74 (emphases added)).  As Kistner correctly notes, however, AESC's motion for summary judgment on her retaliation claim does not address the final written reminder or her request to leave her shift thirty minutes early.  (Doc. No. 30 at 19 n.1).  Thus, the Court will focus its analysis solely on whether AESC retaliated against Kistner by terminating her.

AESC "concedes" that Kistner satisfied "the first three elements of [her] prima facie case." (Doc. No. 27 at 18).  AESC's sole argument is that "there is no evidence of a causal connection between [Kistner's] request for more leave and the termination of her employment."  (Id.).  The causal connection prong for an ADA retaliation claim requires the plaintiff to show that her protected activity is the "but-for" cause for her employer's adverse action.  Pemberton v. Bell's Brewery, Inc., 150 F.4th 751, 767 (6th Cir. 2025).  In other words, she must "put forth some evidence to deduce a causal connection between the adverse action and protected activity that is sufficient to raise the inference that the . . . protected activity was the likely reason for the adverse action."  Id. (citations and internal quotation marks omitted).  Courts "often look for things like temporal proximity between the protected activity and adverse action" to determine whether the plaintiff has satisfied this requirement.  Id. (citation omitted).

It is undisputed that only nine days elapsed between when Kistner requested extended leave on March 21, 2022, and when AESC fired her on March 30, 2022.  (Doc. No. 31 ¶¶ 58–59).  The

Sixth Circuit in <u>Mickey v. Zeidler Tool & Die Co.</u> clarified the circumstances in which temporal proximity alone is sufficient to support an inference of retaliatory discrimination.[5] 516 F.3d 516, 525 (6th Cir. 2008) (reconciling "confusion in the case law" on this causation issue). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." <u>Id.</u> On the other hand, if a longer period of "time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." <u>Id.</u> (citation omitted). This case falls into the former category because nine days is so "very close in time" that it creates an inference of but for causation. <u>See id.</u>; <u>see also</u> <u>McNett v. Hardin Cmty. Fed. Credit Union</u>, 118 Fed. App'x 960, 965 (6th Cir. 2004) (thirteen days); <u>Shefferly v. Health Alliance Plan of Mich.</u>, 94 F. App'x 275, 285 (6th Cir. 2004) (less than three weeks). This inference is sufficient to meet Kistner's minimal burden to establish a prima facie case of ADA retaliation. <u>A.C. ex. rel. J.C.</u>, 711 F.3d at 697 (quoting <u>Nguyen</u>, 229 F.3d at 563) ("The burden of establishing a prima facie *case* in a retaliation action is not onerous, but one easily met.").

AESC argues that it "makes little sense" for Kistner and the Court to rely solely on temporal proximity in this context because "the decision to deny an unreasonable request to extend a leave and thus terminate employment will almost always follow immediately after the request is made." (Doc. No. 27 at 19). As the Sixth Circuit recognized in <u>Mickey</u>, "if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be

---

[5] Although <u>Mickey</u> involved a retaliation claim under the Age Discrimination in Employment Act, its reasoning applies with equal force to ADA retaliation claims. <u>See</u> <u>Down v. Ann Arbor Pub. Schs.</u>, 2021 WL 5873166, at *5 (6th Cir. 2021) (applying <u>Mickey</u> to ADA retaliation claim).

unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation." Mickey, 516 F.3d at 525. Plus, under AESC's proposed rule, "employers who retaliate swiftly and immediately" against employees "would ironically have a stronger defense than those who delay in taking adverse retaliatory action." Id. Notwithstanding these public policy considerations, it also "makes little sense" for the Court to adopt a rule that the Sixth Circuit already rejected. See id.

AESC next asserts that it terminated Kistner "not because she requested more leave, but rather because the leave she requested was an extension of a prior significant period of leave with an uncertain return to work date." (Doc. No. 27 at 18). AESC submits that it chose to fire Kistner because it could not wait indefinitely for her to return to work and perform her onsite duties. AESC has therefore carried its burden to articulate a non-retaliatory basis for terminating Kistner's employment. Mickey, 516 F.3d at 526.

Kistner likewise satisfies her burden to create a factual dispute regarding whether AESC's proffered reasons for firing her were pretextual. One of AESC's reasons for firing Kistner was that she and Orr requested "an uncertain return to work date." (Doc. No. 27 at 18). However, as the Court already explained, a jury could find that Kistner and Orr identified September 1, 2022, as a date certain for Kistner to return to work. If the jury found in favor of Kistner on this disputed factual issue, then it could conclude that AESC's purported reliance on an *uncertain* return date was a pretext for unlawful retaliation.

AESC also asserts that it terminated Kistner because she "could not return to work" after already receiving "a prior significant period of leave." (Doc. No. 27 at 18–19). AESC's Technician Handbook contradicts this argument because it explicitly allows employees to "request additional

leave for consideration through HR" even *after* they take "Medical Leave of up to twelve (12) months." (Doc. No. 35 at 56). Embody's letter also contradicts AESC's stated reason because it specifically invited Kistner to ask for "additional leave" if she believed she needed it as a "reasonable accommodation." (Doc. No. 29-1 at 164). Viewing this evidence in the light most favorable to Kistner, a jury could conclude that Kistner's inability to return to work after twelve months, standing alone, was insufficient to motivate her termination.

For these reasons, Kistner has met her burden to show pretext of retaliation, and AESC is not entitled to summary judgment on Count IV.

2. Title VII and the THRA Protected Activity

Kistner also alleges that AESC retaliated against her in violation of Title VII and the THRA because she "continuously reported and opposed sexual harassment throughout the course of her nine-year employment with" AESC. (Doc. No. 24 ¶ 79). AESC does not dispute that reporting sexual harassment is protected activity under Title VII and the THRA. See Pittington v. Great Smoky Mountain Lumberjack Feud, LLC, 213 F. Supp. 3d 951, 959 (E.D. Tenn. 2016). Rather, AESC argues that Kistner's prima facie claim fails because there is no causal connection between her protected activity and any of the following four alleged adverse employment actions: (1) AESC not engaging her in the interactive process, (2) AESC not granting her additional medical leave, (3) AESC terminating her employment, and (4) AESC issuing her a final written reminder. (Doc. No. 24 ¶¶ 79–82).

It is undisputed that "Brian Sears and Tim Embody in HR were the only two decisionmakers at AESC who denied Kistner's request for more leave and decided to terminate her employment." (Doc. No. 31 ¶ 60). This fact dooms Kistner's retaliation claim because she has not presented any evidence that Sears or Embody ever knew that she reported sexual

harassment. Merely showing that AESC had "general corporate knowledge" is not enough. See Evans v. Professional Transp., Inc., 614 F. App'x 297, 300–01 (6th Cir. 2015); Frazier v. USF Holland, Inc., 250 F. App'x 142, 148 (6th Cir. 2007) ("The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation."). Therefore, Kistner cannot possibly establish a prima facie case that AESC retaliated against her based on her complaints of sexual harassment.

That just leaves Kistner's claim that AESC retaliated against her by issuing her a final written reminder. "It is undisputed that, back in 2015, when [Kistner] was employed by Nissan, she reported an alleged incident of sexual harassment to her then-Lead Josh Blay." (Doc. No. 27 at 2 n.1; see also Doc. No. 29-1 at 21, 27–28). Blay, of course, was the supervisor who recommended issuing Kistner a final written reminder for leaving work early on February 4, 2021. The critical issue for Kistner is that AESC gave her a final written reminder years after she last reported sexual harassment to Blay. This temporal gap is too long to support a causal link between Kistner's protected activity and AESC's adverse action, which means Kistner must come forward "with other evidence of retaliatory conduct to establish causality." Mickey, 516 F.3d at 525; see also Stucky v. Dep't of Educ., 283 F. App'x 503, 505 (9th Cir. 2008) ("The five-year gap between [plaintiff's] last protected activity and her first alleged act of retaliation is too long to substantiate [her] claims that she was retaliated against for engaging in protected activity."). Kistner also fails to present any evidence of retaliatory motive other than her general statement that Blay "had knowledge of [her] reports of sexual harassment throughout the years." (Doc. No. 30 at 23). Therefore, Kistner failed to establish a genuine issue of material fact on her Title VII or THRA retaliation claims.

## IV.    CONCLUSION

For the foregoing reasons, AESC's Motion for Summary Judgment (Doc. No. 26) will be granted in part and denied in part.  The Court will dismiss Counts III and V, and dismiss Count II on Kistner's request for an accommodation to leave her shift early on February 4, 2021.  All other claims will proceed to trial.

An appropriate order will enter.


_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE